# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **WMS INDUSTRIES, INC.** | § | **PLAINTIFF** |
| | § | |
| **V.** | § | **Civil Action No. 1:06CV977-LG-JMR** |
| | § | |
| **FEDERAL INSURANCE COMPANY** | § | **DEFENDANT** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON ISSUES TRIED WITHOUT A JURY PURSUANT TO FED. R. CIV. P. 52

THIS CAUSE came before the Court on March 2, 2009, for trial without a jury. The issues before the Court are whether the conduct of Federal Insurance Company ("Federal") amounts to a breach of the business insurance contract between Federal and WMS Industries, Inc. ("WMS"), and if so, whether Federal acted in bad faith.

### FINDINGS OF FACT

WMS manufactures electronic slot machines and other casino gaming devices. Its headquarters are located in the State of Illinois. WMS has several sales and distribution facilities located globally. One such facility is Premises 24. Premises 24 is in Gulfport, Mississippi and sells, services, leases, and installs slot machines and sells conversion kits and parts to WMS's Mississippi and Louisiana casino customers. Stand alone slot machines are leased to the Mississippi casinos at a rate of $75.00 per day. Local Area Progressive ("LAP") slot machines, which are machines networked within an individual casino, are leased to the Mississippi casinos for $15 per day. Both stand alone and LAP slot machines in Louisiana casinos are leased at a rate of 20 percent of the amounts wagered on each respective machine.

WMS also operates the Mississippi Wide Area Progressive ("WAP") network from

Premises 24.  Under Mississippi law, a WAP monitoring facility must be located in Mississippi and operated by Mississippi-licensed personnel.  The WAP network consists of a group of inter-casino linked slot machines.  Underground T-1 lines, provided by Bell South, connect the WAP computers at Premises 24 to the WAP computers at the various casinos.  These interconnected slot machines all contribute to a shared progressive jackpot.  In other words, for every wager placed on a particular category of WAP machine, the progressive jackpot for all participating WAP machines, in all participating Mississippi casinos, is increased.  For example, all the "Clint Eastwood" WAP machines participate in the "Clint Eastwood" progressive jackpot, while all the "Monopoly" machines participate in the "Monopoly" progressive jackpot, etc.

A casino customer places a wager on the machine.  The machine electronically transmits this data to the central computer at Premises 24.  The central computer records the coin-in information, calculates the new progressive jackpot total, and calculates the amount of each wager owed to WMS.  The computer then transmits the new jackpot information to all participating WAP machines in all participating casinos.  The central computer at Premises 24 retains the data from which WMS will invoice the participating casino for a portion of each wager placed on a WAP slot machine.  Every WAP transaction occurs and is electronically recorded in a fraction of a second.  WMS also pays any jackpot won by a casino customer.  In the event of a jackpot payout on any WAP machine, the central computer electronically resets the jackpot amounts on all affected slot machines.  Troubleshooting and periodic maintenance of the WAP slot machines are the responsibilities of WMS.  They also provide twenty-four hour maintenance and monitoring of all WAP activity on the network.  Except for the T-1 lines, WMS owns all of the WAP equipment at the casinos.  The casino participation in the WAP process is

limited to providing the locations for the WAP slot machines and equipment and periodic payments to WMS for its share of amounts wagered.

On August 29, 2005, Hurricane Katrina made landfall on the Mississippi Gulf Coast. Katrina caused physical damage to Premises 24, including the roof, doors, windows, drywall, computers and computer servers, HVAC units, and interior water damage up to the baseboards. Eleven slot machines stored in the warehouse were damaged. No WAP data transmitted from a slot machine to Premises 24 was physically lost or damaged. However, electrical and telephone services were unavailable. As a result of the hurricane related physical damages and loss of utilities, WMS was forced to suspend its normal operations at Premises 24.

WMS sought and received authority from the Mississippi Gaming Commission to "temporarily" relocate its WAP monitoring operations. On September 11, 2005, WMS resumed its Premises 24 WAP operations at its facilities in Reno, Nevada. WAP operations thus resumed for the "undamaged" Mississippi casino customers in Vicksburg, Robinsonville, Greenville, and Lula. After repairs, WMS moved back into Premises 24 on November 14, 2005. WAP operations were resumed at Premises 24 on December 2, 2005.

At the time Hurricane Katrina struck the Gulf Coast, WMS had in force a business insurance policy, purchased from Federal. The policy provided several forms of coverage for business related losses for different scheduled WMS locations, including Premises 24. The premises coverage included "Business Income and Extra Expense" ("BI/EE") coverage with a

limit of $100,000,000.[1]  The policy also provided additional overlapping business income

coverages with lesser limits.  For example, there was "Loss of Utilities" coverage, which covered

losses of business income caused by a disruption of operations from a loss of utilities.[2]  There

---

[1]Premises Coverages
The following Premises Coverages apply only at those premises for which a Limit Of
Insurance applicable to such coverage is shown in the Declarations.

Except as otherwise provided, direct physical loss or damage must:
- be caused by or result from a covered peril; and
- occur at, or within 1,000 feet of, the premises, other than a dependent
  business premises, shown in the Declarations.

Business Income And Extra Expense
We will pay for the actual:
- business income loss you incur due to the actual impairment of your operations;
  and
- extra expense you incur due to the actual or potential impairment of your
  operations,
  during the period of restoration, not to exceed the applicable Limit of Insurance
  for Business Income With Extra Expense shown in the Declarations
  [$100,000,000].

This actual or potential impairment of operations must be caused by or result from direct
physical loss or damage by a covered peril to property, unless otherwise stated.

[2]Loss Of Utilities
We will pay for the actual:
- business income loss you incur due to the actual impairment of your operations;
  and
- extra expense you incur due to the actual or potential impairment of your
  operations,
during the period of restoration, not to exceed the applicable Limit of Insurance for Loss
Of Utilities show under the Business Income in the Declarations [$2,500,000].

This actual or potential impairment of operations must be caused by or result from direct
physical loss or damage by a covered peril to:
- building;
- personal property of a utility located either inside or outside of a building; or
- service property.

was also "Dependent Business Premises" coverage, which covered losses of business income caused by damage to a customer's business premises.[3]  The policy also contains sections that define many of the terms contained in the policy.  Of particular importance in this case are the

---

[3] Dependent Business Premises
We will pay for the actual:
- business income loss you incur due to the actual impairment of your operations; and
- extra expense you incur due to the actual or potential impairment of your operations,

during the period of restoration, not to exceed the applicable Limit Of Insurance for Dependent Business Premises show under the Business Income in the Declarations [$1,000,000].

This actual or potential impairment of operations must be caused by or result from direct physical loss or damage by a covered peril to property or personal property of a dependent business premises at a dependent business premises.

You may purchase higher limits for specific dependent business premises only by showing such premises in the Declarations.  Such higher limits apply to actual business income loss or extra expense only if the covered direct physical loss or damage occurs at such dependent business premises.

This Additional Coverage does not apply if the direct physical loss or damage is caused by or results from earthquake or flood.

definitions of "period of restoration"[4] and "operations."[5]

[4]Period Of Restoration
Period of restoration means the period of time that, for business income, begins:

A.    Immediately after the time of direct physical loss or damage by the covered period to property or

B.    On the date operations would have begun if the direct physical loss or damage had not occurred, when loss or damage to any of the following delays the start of operations:

    1.    New buildings whether complete or under construction;

    2.    Alterations or additions to existing buildings; or

    3.    Personal property consisting of materials, machinery, equipment, supplies and temporary structures used in the construction of, or for making additions to, alterations or repairs to the structure.

Period of restoration means the period of time that, for extra expense, begins immediately after the time of direct physical loss or damage by a covered peril to property.

Period of restoration will continue until your operations are restored, with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage occurred, including the time required to:

A.    Repair or replace the property; or

B.    Repair or replace the property to comply with the minimum standard of any enforceable ordinance or law that:

    1.    Regulates the repair or replacement of any property;

    2.    Requires the tearing down of parts of any property not damaged by a covered peril; and

    3.    Is in force prior to the date of the direct physical loss or damage,

not exceeding the applicable number of day show as Extended Period in the Declarations [365 days] beginning on the date that:

- for manufacturing risks, the lost or damaged property is actually repaired or replaced and production capability is restored to the level that existed prior to the date the direct physical loss or damage occurred; or

- for all other risks, the lost or damaged property is actually repaired or replaced and your operations are restored.

The expiration date of this policy will not cut short the period of restoration.

If loss or damage occurs at a:

- dependent business premises; or

- utility,

for the purpose of determining period of restoration following such loss or damage, property includes:

WMS reported the losses related to Hurricane Katrina damages at Premises 24 to Federal on August 31, 2005. The next day, Federal assigned the claim to Terry Young, who was under senior home office claim examiner Christopher Bender's supervision. In November WMS hired public adjuster Kevin Dawson to formulate and present its claim. Based upon its interpretation of the insurance contract and the loss amounts, WMS ultimately filed a claim with Federal for $39.3 million in lost income, and several hundred thousand dollars in extra expenses. All property damages, including the building and contents, at Premises 24 were paid, and the parties do not dispute the amounts paid due to Hurricane Katrina related physical damage to Premises 24. Instead, the parties do not agree on the amounts to which WMS believes it is entitled under the various business income provisions of the policy.

---

- personal property of a utility; or
- Personal property of a dependent business premises.

In determining the business income amount that would have existed if no direct physical loss or damage occurred, we will reduce such amount to the extent necessary to reflect unfavorable economic conditions attributable to the impact the covered peril had in the geographic area where the lost or damaged property is located.

Period of restoration does not include any increased period required to comply with any ordinance or law:
- you were required to comply with before the direct physical loss or damage;
- involving any property outside the legal boundary of the premises shown in the Declarations; or
- that regulates the repair or replacement of any property that was lost or damaged by an excluded peril. If direct physical loss or damage is caused by or results from both a covered peril and an excluded peril, the period of restoration only includes the length of time required to repair or replace the property lost or damaged by the covered peril.

[5]Operations
Operations means your business activities occurring at your premises, including your activities as a lessor of premises, prior to the loss or damage.

Federal initially acknowledged that BI/EE coverage might apply. However, Federal later denied that Hurricane Katrina related damage to Premises 24 caused an "impairment of operations." Instead, on May 26, 2006, Federal paid the $1,000,000 policy limits for Dependent Business Premises coverage and later tendered $54,744.36 in Loss of Utilities coverage.[6] Despite requests for additional BI/EE losses, Federal continued to deny that BI/EE coverage applied. However, Federal later conceded that additional BI/EE applied and tendered $36,611 on December 15, 2008, and $7,322.20 in interest on January 30, 2009. These payments were made under the Loss of Utilities provision of the policy. WMS has not negotiated these last three checks.

CONCLUSIONS OF LAW

BREACH OF CONTRACT

To prove its breach of contract claim, WMS must prove by a preponderance of the evidence (1) the existence of a valid and enforceable contract between it and Federal, (2) that it breached the contract, and (3) the breach caused WMS to suffer monetary damages. *Warwick v. Matheney*, 603 So. 2d 330, 336 (Miss. 1992). The parties agree that there was a valid and enforceable contract of insurance between them. They agree that the policy provided BI/EE, Dependent Business Premises, and Loss of Utilities coverages, which all applied. They agree that no sums have been paid under BI/EE. However, they disagree over whether there are any

---

[6]The $54,744.36 payment was for WAP loss from the "undamaged" casinos. However, this second check had "in settlement of" printed on the face of the check, and WMS never negotiated it. WMS's Executive Director of Finance and Chief Accounting Officer John McNicholas, Jr., objected to this language on the check. Young responded, "Please note that Federal will not consider WMS's acceptance and negotiation of the $54,774.06 check as a waiver of any of its rights to pursue additional amounts under the Loss of Utilities or Business Income coverages."

outstanding sums due.

Mississippi applies a three-tiered approach to contract interpretation. *Tupelo Redev. Agency v. Abernathy*, 913 So. 2d 278, 284 (¶13) (Miss. 2005). First, the court looks to the "four corners" of the contract and examines the language used. *Id.* The parties' "intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (¶7) (Miss. 2005). The court determines "the parties' intent from 'the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.'" *Favre Prop. Mgmt., LLC v. Cinque Bambini, a Miss. P'ship*, 863 So. 2d 1037, 1045 (¶21) (Miss. Ct. App. 2004) (quoting *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)).

"Particular words should not control," rather, the court reads the contract as a whole, so as to give effect to all of its clauses. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990); *Favre*, 863 So. 2d at 1046 (¶24). The language is construed through its "correct English definition and language usage" in a manner which "makes sense to an intelligent layman familiar only with the basics of English language." *Pursue Energy*, 558 So. 2d at 352. "Of course exceptions exist, i.e., when a word has a distinctive *legal* meaning." *Id.*

If the contract is ambiguous, the Court will, "if possible, harmonize the provisions in accord with the parties' apparent intent." *Id.* A contract is ambiguous if it is capable of more than one interpretation. *Facilities*, 908 So. 2d at 111 (¶7). Whether a contract is ambiguous is a question of law. *Tupelo Redevelopment*, 913 So. 2d 278 at 283 (¶12). "In the event of an ambiguity, the subsequent interpretation presents a question of fact." *Id.*

If the first tier of the process does not resolve the parties' intent, the court moves to the

second tier and applies discretionary canons of construction. *Pursue Energy*, 558 So. 2d at 352. For example, insurance contracts, where ambiguous, are read in favor of indemnity. *J&W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So. 2d 550, 552 (¶9) (Miss. 1998). If the contract still evades clarity, the court moves to the final tier and considers extrinsic evidence. *Facilities*, 908 So. 2d at 111 (¶7).

Applying these rules, the Court finds that the Federal insurance contract is unambiguous.[7] The policy provides several overlapping, non-exclusive business income coverages, which contain various loss limitations, for various periods of time. Each coverage provision is tied to a different type of covered loss. In the context of this case, Hurricane Katrina caused physical damage and loss of utilities to Premises 24, resulting in a loss of operations. Hurricane Katrina also caused damage to dependent business premises (i.e., the casinos), resulting in a loss of casino operations. Business income losses related to the loss of operations at Premises 24 and the loss of casino operations followed.

WMS has taken several positions[8] regarding the application of the Federal policy to the facts of this case. WMS contends that the term "operations" should be broadly construed. According to WMS the "operations" at Premises 24 must necessarily include the interrelated workings of WMS and the Mississippi and Louisiana casinos. In other words, until the damaged

---

[7]Having determined that the contract is unambiguous as a matter of law, any testimony intended to interpret the contract provisions was not considered.

[8]One such position was that the casinos were not dependent business premises but instead, were "online access providers." According to WMS, since the casinos were online access providers, the Dependent Business Premises coverage did not apply. At the conclusion of the trial, WMS withdrew this argument and agreed that Dependent Business Premises coverage applied to the damaged casinos. (Tr. at 1373).

Mississippi casinos were back in business and on line, Premises 24 "operations" were not restored, and WMS would be entitled to BI/EE damages reimbursement. This argument is not persuasive. First, the term "operations," as defined by the policy, " means your business activities *occurring at your premises*." Except for the Dependent Business Premises coverage, the Federal policy does not purport to insure the gaming industry or operations of coastal casinos. Second, to expand the definition of "operations" as WMS suggests, would render the Dependent Business Premises coverage superfluous. No doubt WMS enjoyed a symbiotic business relationship with the casinos; however, the notion that this business relationship somehow makes the casino industry part of Premises 24 "operations" for purposes of coverage under the Federal insurance contract is without contract language support. The argument was eloquently presented, but in the final analysis, the square hole rejects the round peg. Under the unambiguous terms of the policy, in order to be compensable, the BI/EE losses must have a causal connection to the physical damage that impacted the operations *at* Premises 24.

WMS also argues that the period of restoration should have been extended to include that period of time needed by the casinos to get back on their feet. This contention is likewise unpersuasive. First, a plain reading of the salient provision shows that the period of restoration continues "until *your operations are restored*, with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage occurred." The period of restoration is tied to the operations of Premises 24, not the operations of WMS's coastal casino customers. The "physical loss or damage" refers to the loss or damage at Premises 24. Second, the Dependent Business Premises coverage provides its own "period of restoration." Once again, WMS's interpretation of the "period of restoration"

language would render the Dependent Business Premises separate period of restoration provision superfluous.

A plain reading of the BI/EE provision reveals that Federal must pay for (1) certain business income losses, (2) that WMS incurred due to the impairment of its selling, leasing, and WAP activities occurring at Premises 24, (3) as long as the impairment to Premises 24 is caused by Hurricane Katrina damage to property at, or within 1,000 feet of, Premises 24. Federal's obligation continues "during the period of restoration," which continues until (1) the pre-Katrina business activities at Premises 24 are restored, with reasonable speed, to the level which would have produced the income that would have existed had the loss not happened, and, (2) the property is repaired. The Court finds that it is undisputed that Hurricane Katrina was a covered peril, which caused physical damage to Premises 24. It is also the finding of the Court that a covered peril caused an impairment of operations at Premises 24, resulting in lost business income. It is also the finding of the Court that the property and operations at Premises 24 were "restored," within the meaning of the insurance contract, on December 2, 2005. The 365 days of extended period of indemnity would begin to run from this date. Thus, Federal owed WMS payments for BI/EE from August 31, 2005, through December 2, 2006, as long as the lost income was causally connected to the physical damage and impairment of operations at Premises 24. WMS would be compensated only once for each dollar of lost income. Therefore, whether WMS was compensated under the $100,000,000 BI/EE fund or under the Loss of Utilities $2,500,000 fund is not important, as long as all of the income losses were compensated.

Dependent Business Premises coverage applied to windstorm damage. Flood damage is excluded. The coverage is limited to $1,000,000. Although additional coverage for Dependent

Business Premises was offered, WMS declined to purchase it. Dependent business premises include the casinos, since by definition they "accept[ed Premises 24's] products and services." (Ex. P-72 at FED 1960). The Dependent Business Premises period of restoration is tied to the date that the dependent business premises property is restored. Hurricane Katrina winds were a covered peril, and they caused damage to the coastal Mississippi and New Orleans area casinos, which in turn impaired the casino operations. As a result, WMS experienced a loss of income due to its impaired customer casinos. The date that the last damaged casino reopened was June 30, 2007. Thus, Federal owed WMS any loss of business income it would have received from the damaged casinos from August 29, 2005, through June 30, 2007. Recognizing that this loss would, by far and away, exceed policy limits, Federal paid WMS the $1,000,000 Dependent Business Premises policy limits.[9]

D<small>AMAGES</small>

The Court next examines whether there are any outstanding damages owed under these coverages. Since the combined BI/EE limit is more than enough to cover any amount in dispute, regardless of which fund is used, the Court need only examine the BI/EE coverage damages generally.

Contract damages are ordinarily based on the injured party's expectation interest and are

_____

[9]As noted above flood damage is excluded from Dependent Business Premises coverage. During the claim adjustment process, Federal estimated that Hurricane Katrina winds accounted for approximately 20% of the damages to the casinos. Based upon their calculations, Federal determined that the lost income associated with only eight of the "damaged" Mississippi casinos through June 30, 2006, was approximately $6,442,000. As a result of these calculations, Federal recognized that business income losses due to wind damage at the coastal casinos engaged in business activities with WMS resulted in Dependent Business Premises losses far above the policy limits of $1,000,000.

intended to put it in as good a position as it would have been had the contract been performed. *Theobald v. Nosser*, 752 So. 2d 1036, 1042 (Miss. 1999).  The contract provides, "Business income" is "net profit or loss . . . that would have been earned or incurred before income taxes." (Ex. P-72 at FED 2036).  Business income does not include "bank interest or investment income."  *Id.*  Further:

> The amount of business income loss will be determined based on the:
>
> - net income of your business before the direct physical loss or damage occurred;
>
> - the likely net income of your business if no loss or damage occurred, but not including any business income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the covered loss on customers or on other businesses; and
>
> - your continuing operating expenses, including your continuing normal payroll expenses, necessary to resume operations with the same quality of service that existed just before the direct physical loss or damage.

*Id.* at FED 1879.  "We will reduce the amount of any business income loss payment to the extent you can resume or continue your operations, in whole or in part, by using . . . any other available premises."  *Id.*

Under the BI/EE coverage, WMS is entitled to recover only that lost income causally connected to the physical damages and loss of operations at Premises 24.  The Court will examine the income streams to determine what lost income was caused by Premises 24 damage.

I.      SELLING (GAMES, CONVERSION KITS, AND PARTS)

WMS had Premises 24 sales employees and those from other regional offices contact the Mississippi and Louisiana casinos within a couple of months after Katrina.  The undamaged

-14-

casinos continued to place orders after this time, but the damaged ones did not. According to the testimony, Premises 24 was able to fill any post-Katrina orders by undamaged casinos through other WMS locations. As for pre-Katrina orders, WMS Executive Vice President, Chief Financial Officer, and Treasurer Scott Schweinfurth testified:

> I believe we had some units that were scheduled to ship during . . . September that ended up not shipping that month, either because the casinos were not ready to receive them, because they were getting back up and running, or because the games happened to be at our Gulfport facility at the time the hurricane struck.

(Tr. at 153). Eleven slot machines were damaged in Premises 24's warehouse. WMS submitted and received an inventory payment for these machines. WMS represents that there is no dispute remaining as to these eleven machines. Therefore, the Court finds that Premises 24 damage and loss of operations did not cause any actual lost sales. According to the testimony, WMS was able to fill any new sales, conversion kits or parts orders through other WMS locations.

II.     LEASING (STAND-ALONE AND LAP)

The leased stand-alone and LAP machines in Mississippi were leased for fixed daily rates. The revenues for machines that were in these casinos as of August 29, 2005, were not dependent upon Premises 24's continued operation. These machines were leased to Louisiana casinos for twenty percent of the amounts wagered. There was no testimony that these amounts were being monitored and billed from Premises 24. Instead, lease payments continued to be collected by WMS.

III.    WAP

The final revenue stream realized at Premises 24 is WAP income. Of course, the WAP revenue stream was dependent upon the operations at Premises 24. First, the WAP system was

down from August 29, through September 11, 2005. After deducting the first 48 hours, BI/EE coverage would begin on August 31, 2005. Thus, Premises 24 damage caused a loss of all WAP revenues from August 31, 2005, until September 11, 2005, when WAP operations were restored in Reno, Nevada.

The WAP was introduced in Mississippi in October of 2004. By the time Hurricane Katrina struck the Mississippi Coast, it had been in operation for less than one year. From October of 2004 through July of 2005 (the last full month it was in operation before the storm), WAP monthly revenues had increased from $13,372.76 to $259,639.12, on an average of 77 percent per month. For the 26 days in August that WMS received WAP revenues, "Monopoly Money" earned $153,847.87 and "Reel Heroes" earned $141,665.46. Had WAP functioned for the remaining five days, August "Monopoly Money" revenues would have totaled $183,434 and "Reel Heroes" $168,908.82.[10] This gives a daily rate of $5,917.23 and $5,448.67, respectively. Thus, the lost WAP revenue for August 31, 2005, equals $11,365.90. Subtracting cost of gaming revenue at 18.2 percent ($2,068.59), depreciation at 23.3 percent[11] ($2,648.25), and commission at 0.9 percent[12] ($102.29), this leaves a lost WAP profit of $6,546.77 for August 31, 2005.

In the month of September, 2005, this "Monopoly Money" figure would have grown by

---

[10]The Court extrapolated these figures by multiplying the revenue realized times 31 days it should have remained open, then dividing it by the 26 days it was open. This assumes that August revenues would have risen at the same pace in the last five days that it did in the first 26. The Court did not consider the Nevada growth rates applied by the experts for August, because Mississippi's August figures were already outpacing Nevada's.

[11]Depreciation was 23.3 percent of gaming operation revenue in fiscal year 2006.

[12]Commissions expense was 0.9 percent of gaming operation revenue in fiscal year 2006.

27 percent, plus $11,345.36[13], and "Reel Heroes" by 11 percent, plus $15,912.99. Thus, "Monopoly Money" should have equaled $244,306.54, and "Reel Heroes" should have equaled $203,401.78. These figures give daily rates of $8,143.55 and $6,780.06, respectively. Multiplied times the first eleven days in September, this gives lost WAP revenue of $164,159.71. Subtracting 18.2 percent cost of gaming revenue ($29,877.07), 23.3 percent depreciation ($38,249.21), and 0.9 percent commission ($1,477.44) leaves a lost WAP profit of $94,555.99, for September 1-11, 2005.

It is undisputed that WMS mitigated its WAP losses while the operations were conducted in Reno, Nevada. The undamaged Mississippi casinos were able to resume participation in the WAP network from September 11, 2005, forward. Of course, the damaged Mississippi casino slot machines were not yet back online. Therefore, *Premises 24 damage* to the WAP network was fully mitigated as of September 11, 2005, and Premises 24 loss of operation did not cause further WAP loss after September 11, 2005. This brings the total WAP loss covered by the BI/EE provisions of the Federal policy to $101,102.76. To prevent double recovery, the Court deducts the $91,385.06 already tendered in Loss of Utilities payments. Therefore the remaining

---

[13]The figures added to the growth rates account for the fact that this would have been Hard Rock Casino's first month of operation. Grand Casino Biloxi was used as a surrogate to predict Hard Rock's WAP performance for this month.

covered WAP loss is $9,717.70.[14]  Additionally, WMS is awarded prejudgment interest at the rate of eight percent, from May 26, 2006, until the date of the judgment, August 4, 2009, in the amount of $1,701.80.

BAD FAITH

"[A] bad faith refusal claim is an 'independent tort' separable in both law and fact from the contract claim asserted by an insured under the terms of the policy." *Hartford Underwriters Ins. Co. v. Williams*, 936 So. 2d 888, 895 (¶21) (Miss. 2006).  To prove its claim for bad faith punitive damages, WMS must show (1) Federal lacked an arguable or legitimate basis for denying the claim, and (2) Federal committed a willful or malicious wrong, or acted with gross and reckless disregard of WMS's rights.  *United Am. Ins. Co. v. Merrill*, 978 So. 2d 613, 634 (¶104) (Miss. 2007).  Federal "need only show that it had reasonable justifications, either in fact or in law, to deny payment." *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008).  The mere fact that Federal's denial of coverage proves to be incorrect is insufficient to prove bad faith. *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (¶9) (Miss. 2003).  However, Federal had a duty to re-evaluate WMS's claim even after the lawsuit was filed. *Broussard*, 523 F.3d at 629.  Extra-contractual damages, including attorney fees, are available

---

[14]The Court notes that Federal filed a motion to exclude portions of WMS's damages expert's testimony.  McNicholas was both a fact and expert witness.  In particular, Federal challenged his expert causation analysis.  The Court considered his expert testimony as to damages.  However, McNicholas did not limit his testimony to lost business income caused by physical damage and loss of operations to Premises 24.  Instead, he assessed WMS's business income loss caused by Hurricane Katrina generally, including streams of income not realized due to the loss of its casino customers.  In this vein, the testimony was not helpful to the finder of fact.  The Court does not doubt that WMS suffered losses as a result of Hurricane Katrina's impact on the casino industry as a whole.  However, the BI/EE provision of the Federal policy covers business losses caused by physical damage and loss of operations at Premises 24.

when only the first prong is shown. *Essinger v. Liberty Mut. Fire Ins. Co.*, 534 F.3d 450, 451 (5th Cir. 2008).

For example, extra-contractual damages include emotional distress, "attorney fees and legal expenses reasonably and necessarily incurred," inconvenience, accounting fees, and economic loss. *Allred v. Fairchild*, 916 So. 2d 529, 532-33 (¶¶9-12) (Miss. 2005) (discussing award of accounting fees under Rule 54(d) and *Veasley*); *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992); *Pioneer Life Ins. Co. of Ill. v. Moss*, 513 So. 2d 927, 931 (Miss. 1987) (Robertson, J., concurring). In *Veasley*, evidence that the insurance company's bad faith caused plaintiff "worry, anxiety, insomnia, and depression" supported a jury award for emotional distress damages. *Veasley*, 610 So. 2d at 295.

I.    L̲A̲C̲K̲ ̲O̲F̲ ̲A̲R̲G̲U̲A̲B̲L̲E̲ ̲O̲R̲ ̲L̲E̲G̲I̲T̲I̲M̲A̲T̲E̲ ̲R̲E̲A̲S̲O̲N̲

According to Federal, they denied coverage under the BI/EE provisions of the policy because no loss was caused by a loss of operations at Premises 24. They argued that WMS experienced losses due to the destruction of the coast casino industry. Consequently, Federal tendered the Dependent Business Premises policy limits. Federal later acknowledged that Premises 24 was uninhabitable and that WAP losses associated with the undamaged casinos for the first thirteen days were caused by a loss of operations at Premises 24. Two years later Federal tendered an additional amount for the thirteen day WAP loss from the damaged casinos. Federal witnesses testified that the reason that they did not originally pay for the thirteen day damaged casino WAP loss, was because they determined that they had already paid this loss under the Dependent Business Premises coverage. However, Federal all along acknowledged that Dependent Business Premises was an additional, not exclusive coverage, and that losses

under this coverage exceeded the $1,000,000 policy limit. In addition, the Dependent Business Premises period of restoration is longer than the BI/EE period of restoration. To treat the thirteen day WAP loss for the damaged casinos as "already paid" under the Dependent Business Premises coverage, is tantamount to treating the Dependent Business Premises provision as a separate or exclusive coverage. As a result, Federal denied or delayed payments for WAP business income losses.

Presumably, Federal lacked an arguable reason or legitimate basis for its failure to pay, or delay in making payments for business income losses due to incapacitated WAP system between August 31, 2005, and September 11, 2005. Thus, WMS would arguably be entitled to extra-contractual damages under *Veasley* that are associated with Federal's conduct in this regard. Unfortunately, there is no evidence from which the finder of fact can reasonably assess the extra-contractual damages on this portion of the claim. In essence, there is no evidence, such as how many relative hours were spent by counsel, experts, and WMS to recover this small portion of the overall claim, or other evidence from which the finder of fact can reasonably extrapolate an extra-contractual damages figure. The Court has awarded eight percent prejudgment interest on the outstanding amount, which is sufficient to compensate WMS for any lost interest. WMS did not sustain its burden of proof as to what reasonable amounts would be recoverable as extra-contractual damages.

II.     WILFULNESS, MALICIOUSNESS, OR RECKLESS DISREGARD

The Court finds that WMS failed to establish that Federal, or its agents acted willfully, maliciously, or with reckless disregard for WMS's rights. It is the finding of the Court that Young and Bender did not intentionally or recklessly adjust the WMS claim in order to limit

Federal's exposure or to diminish WMS's recovery.[15]

**IT IS THEREFORE ORDERED AND ADJUDGED** that Plaintiff WMS Industries, Inc., is entitled to a judgment against Defendant Federal Insurance Company in the amount of $9,717.70, plus prejudgment interest in the amount of $1,701.80. Plaintiff shall also recover costs from the Defendant. A separate judgment will be entered herein in accordance with these findings of fact and conclusions of law as required by FED. R. CIV. P. 58(a).

**SO ORDERED AND ADJUDGED** this the 4th day of August, 2009.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

---

[15]The Court notes that Federal filed *Daubert* motions to WMS's two bad faith experts. The Court ruled on the motion to exclude Dawson on the record. As for the outstanding motion to exclude Peter Knowe, the Court's conclusion regarding bad faith renders that motion moot. The Court as the finder of fact was not persuaded by his testimony. Instead, the Court is persuaded that Federal did not act wilfully, maliciously or with reckless disregard.